## THE TRANSFER NO. 9.

### (District Court, E. D. New York. January 27, 1900.)

COLLISION—STATIONARY VESSEL—NEGLIGENT NAVIGATION BY TUG.

A collision between a float in tow of a tug and a steamboat lying near her dock in the East river *held* to have been caused by the fault of the tug in failing to keep near the center of the channel, as required by statute and by prudent navigation.

In Admiralty. Suit to recover damages for collision.

Wilcox, Adams & Green (Mr. Adams, of counsel), for libelant.
Strong & Cadwalader (Mr. Taft, of counsel), for claimant.

THOMAS, District Judge. This action involves a collision between steam tug Transfer No. 9, with a car float on either side, and the Emmons, a steamboat of the side-wheel pattern, of about 115 feet in length, used for the purpose of transferring emigrants. The place of collision was in the East river, about opposite the Barge Office, where the Emmons was accustomed to lie. It is claimed on the part of the libelant that the Emmons was heading about N. W. by N., and that she was lying at the time not more than 150 feet diagonally from the Barge Office, awaiting the landing of a barge by another steamboat, which preceded her. The tide was about an hour and a half ebb, but a flood tide set up about the Battery wall, and extended into the river to distances hereinafter stated. It is urged by the libelant that the tug, with her floats, attempted to go between the Emmons and the dock, and that the accident happened in the course of such attempt, by the port end of the port float striking a glancing blow upon the port side of the Emmons, near the wheel, while the float was under full headway.

One fact seems to be sustained by the evidence of both parties, viz. if the Transfer had pursued the course occupied by her immediately after passing pier A, which was some 1,650 feet away, she would have passed under the stern of the Emmons. But what did she do thereafter? The inquiry is solved by the answer. This pleading states that "when going around the Battery the Transfer kept about five hundred feet off shore, in order to take advantage of the flood eddy which prevailed at that point." The evidence of the captains of Transfers No. 9 and No. 7 is that at the time of the collision the stern of No. 9 was probably in the eddy tide, while her head was in the ebb tide, but both such persons state that it is desirable that the floats coming into the East river be kept without such tide. The answer alleges, and the evidence of these witnesses denies, a probable fact. The witnesses for the claimant place the float about 500 feet from the shore, while the evidence of the libelant's witnesses places it quite near the dock. But it seems probable that the float was entirely within or entirely without the influence of the eddy tide, as it is not easily believable that the port side of the float was within, and the starboard side without, the flood eddy. The statement of the answer that the Transfer was taking advantage of the flood eddy accords

with probability. But how broad was the eddy? It appears from the claimant's evidence that at the Aquarium the eddy may extend out 400 feet, while it narrows in the direction of the Barge Office, opposite which, with the wind prevailing at the time in question, it might extend 200 or 300 feet off the shore. Hence, crediting the Transfer with a belt of water 300 feet in width, wherein she could take advantage of the flood eddy, it remains to discover how much water was occupied. The libelant's evidence is that the Emmons was 150 feet off shore; the claimant's evidence tends to put her 200 feet away from the dock. The Emmons was 115 feet long. Hence the Emmons and the space between her and the dock accounts for 265 feet of the total 300 feet of the flood eddy. This left 35 feet for No. 9 and her tow, whose total width was 119 feet, to pass, which would cause 64 feet of the tow to lap on the Emmons, and, if the Emmons were lying still, the corner of the port float would strike the former vessel 31 feet aft of her bow. But, as the steamer had been put in forward motion, the port side of the float struck the Emmons somewhat abaft the point just now suggested. There seems to be no way of escaping this conclusion, unless the tow be placed outside the flood eddy, which there is much difficulty in doing. But, if the above conclusion is correct, there is no opportunity for a holding that the Emmons backed across the bow of the Transfer. When the Transfer lapped the Emmons, the latter undoubtedly went forward, and hence was struck at the location of her wheel, rather than further forward, as above discussed. Nor, after a careful scrutiny of the evidence, does there seem to be any tenable ground for holding that any act or omission of the Emmons was a proximate cause of the accident. She was practically stationary. There was no reason, consistent with any prudence, which would suggest the Transfer passing, save under her stern; and when the tug gave a signal to that effect there was no occasion for her to answer it, although her testimony is that she did her full duty in that regard. The evidence of several of the libelant's witnesses, that the Transfer attempted to go between the Emmons' bow and the dock, and that she would have collided with the Staten Island ferry rack, had it not been for the contact with the Emmons, seems to the court to indicate erroneous observation or statement, and it is only after a critical examination of the evidence that the Emmons has been relieved from liability, as no ground for the same appears.

But by what right was the Transfer so near the shore? She was in the East river, and, even if not constrained by the statute to seek the middle of the channel, ordinary prudence required that she keep nearer to that locality. Her captain states that boats going out of the river pass inside of incoming boats. In this case not more than 300 feet were left for this purpose. Ferryboats of several companies enter and leave their slips at this point, and craft pursuing the channel should leave abundant room for this purpose. The proximity of the Transfer to the shore was unnecessary, save to gain some advantage from the eddy, and violates both the statute and the demands of prudent navigation. Moreover, when the Transfer knew that she should and must go to starboard, she should have ported her wheel

sufficiently to pass the Emmons, and if she did not do this with abundant vigor, or at a sufficiently early moment, the fault was her own. The channel is over 2,700 feet wide at this point, and there was no reason for the failure to use the ample room afforded.

The following sketch illustrates the claimant's contention (No. 1), and the conclusions reached by the court (No. 2):

The above sketch illustrates the view taken by the court, as well as the port side of the float 500 feet away from the dock, and 500 feet away from the point of collision, when the Emmons began to back, as the claimant urges. While the Transfer was going that distance, it is contended by the claimant that the Emmons backed her bow to some distance beyond the port side of the float, which would be 235 feet, plus 115 feet, plus the unstated distance to the starboard side of the port float to which the bow of the Emmons went, and that thereupon, and before the collision, the Emmons went forward, so that the port side of the float struck her amidships, which distance would be at least one-half the length of the Emmons, or $57\frac{1}{2}$ feet, and also the distance that the bow went to the starboard of the inside float. The specifically stated distance thus traveled by the Emmons would be 407 feet, to which should be added the unstated distance the bow went to the starboard of the inner float and returned. While these last distances are not given, the description seems to increase the 407 feet traveled by the Emmons, as above given, to 500 feet. Hence, while the float traveled 500 feet forward, the Emmons traveled $453\frac{1}{2}$ feet

backward and $46\frac{1}{2}$ forward. The float was going at $4\frac{1}{2}$ miles per hour. The Emmons was stationary. Does it not seem too strange for belief that the Emmons, awaiting a chance to dock, should suddenly, with no sufficient reason, contrary to her proposed destination, go astern over 400 feet, and then stop, reverse, and go ahead in front of a threatening float? The Emmons was 150 feet from her dock. Did she add over 400 feet to this distance, taking her stern over 600 feet from the dock, 300 feet beyond the eddy tide, in the way of the busy traffic of the river, with no signals? On the part of those in charge of the Emmons there is an entire absence of motive for making this long backward motion; hence there was no motive which should have carried the Emmons in front of the float. There was a motive for navigating the Transfer so that her course brought her in collision with the Emmons, and that motive is set out in answer. It was to take advantage of the flood eddy. If the allegation is true, the cause of the collision is solved, and the Transfer is culpable. The probabilities gathered from the evidence favor this conclusion. The libelant should have a decree, with costs.